RECEIVED

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
ALABAMA (SOUTHERN DIVISION)

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

TOMMY C. COVINGTON,

      Plaintiff,

ZIMMER HOLDINGS, INC.

      Defendant.

:
:
:
:
:
:
:

Civil Action No.: *1:11 CV 26*

**JURY TRIAL REQUESTED**

## COMPLAINT AND JURY DEMAND

Plaintiff, Tommy C. Covington, by way of Complaint against Defendant, says:

### NATURE OF THE CASE

1.    This is an action for damages suffered by the Plaintiff , Tommy C. Covington, that as a direct and proximate result of Defendant's wrongful conduct in connection with the development, design, manufacture, distribution, and selling of Defendant's hip replacement product, the Durom Acetabular Component (hereinafter "Durom Cup.")

2.    Defendant knew or should have known that the Durom Cup can loosen and separate from acetabulum (hip socket) in patients, such as Plaintiff Tommy C. Covington, causing personal injury, significant pain, and loss of movement, and that this injury can only be remedied through subsequent revision surgery and/or hip replacement. Further, Defendant misled health care professionals and the public into believing that the Durom Cup was safe and effective for use in hip replacement surgery; engaged in deceptive, misleading and unconscionable promotional or sales methods to convince

1

health care professionals to utilize the Durom Cup, even though Defendants knew or should have known that the Durom Cup was unreasonably unsafe; and failed to warn health care professionals and the public about the safety risks of the Durom Cup.

## PARTIES

3.      Plaintiff Tommy C. Covington is a resident of Daleville, Dale County, Alabama and is over the age of nineteen years.

4.      Defendant Zimmer Holdings, Inc. (hereinafter "Zimmer") is a corporation incorporated under the laws of Delaware with its principal place of business located in Warsaw, Indiana.

5.      At all times material hereto, Zimmer developed, designed, tested, manufactured. distributed, marketed, and sold the Durom Cup. Zimmer products, including the Durom Cup, are sold throughout the world, including within the state of Alabama.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs

7.      Venue in this action properly lies in the District of Alabama pursuant to 28 U.S.C. § 1391(a), as a substantial number of the events, actions or omissions giving rise to Plaintiffs' claims occurred in this district. At all times material hereto, Defendant conducted substantial business in this district.

8.      This suit alleges violations of Alabama Extended Manufacturer's Liability Doctrine. (hereinafter "AEMLD"), and seeks to recover damages and other relief, including

2

the costs of suit and punitive damages, for the injuries Plaintiffs have sustained as a result of Defendant's acts and omissions in violation of AEMLD.

## **FACTUAL BACKGROUND**

9.      Zimmer was founded in 1927, and purports to be a worldwide leader in the design and manufacture of orthopaedic reconstructive, spinal and trauma devices, dental implants, and related orthopaedic surgical products. Zimmer's 2008 sales exceeded $4 billion.

10.      Total hip arthroplasty (THA), also called total hip replacement, is a common medical procedure performed on more than 442,000 patients in the U.S each year, according to a Millenium Research Group report issued March 2008. The surgery is designed to help relieve pain and improve joint function in people with severe hip degeneration due to arthritis or trauma.

11.      The Durom Cup is a metal monoblock alloy cup with a coating of titanium plasma spray. It is available is sizes from 44 to 66mm, and is intended for press-fit fixation in the acetabulum, which is the cup-shaped cavity at the base of the hipbone into which the ball-shaped head of the femur fits. The Durom Cup is not cemented or screwed in place during implantation, rather the patient's bone is supposed to bond to the implant.

12.      The Durom Cup was launched in Europe in 2003 for hip resurfacing, a procedure that requires less bone removal than conventional THA, but also uses a different surgical technique. In the United States, the Durom Cup was approved for use in THA by the FDA on or about March 2006.

3

13.     The Durom Cup model distributed in the United States differs from the model distributed in Europe in that the coating on the Durom Cup sold in the United States has a different structure and is thicker compared to the coating on the model sold outside the United States. Additionally, with respect to the implantation of the Durom Cup, orthopedic surgeons implanting the Durom Cup model distributed outside the United States received different training and instructions than those surgeons implanting the Durom Cup model marketed within the United States.

14.     In April 2008, Dr. Lawrence Dorr, a Zimmer consultant, notified Defendant that approximately 8 percent of his patients who had the Durom Cup implanted required revision surgery and that he was discontinuing use of the product.

15.     On July 22, 2008, Defendant sent a letter to surgeons notifying them that it was temporarily suspending the marketing and distribution of the Durom Cup in the United States to allow it time to update product labeling, to provide more detailed surgical technique instructions and implement a surgical training program for U.S. surgeons. Although Defendant denied that the product was defective in its manufacture or design, it admitted that "additional surgical technique instructions and training are necessary in the United States, and we strongly recommend that U.S. surgeons stop implanting the Durom Cup until receiving such training."

16.     In a press release dated July 22, 2008, Zimmer stated that it had reviewed data on more than 1,300 patients that had the Durom Cup implanted in the United States (approximately 10 percent of all Durom Cup procedures in the United States as of that date). Defendant further stated that where "appropriate and necessary surgical techniques" had been used, the revision rate was 1.5 percent. By contrast, the revision rate

for remaining patients was 5.7 percent.

17.     In a letter dated August 16, 2008, Defendant sent a letter to surgeons, providing them with updated product labeling on the Durom Cup more detailed surgical technique instructions, and specific information regarding a comprehensive surgical training program, which Defendant stated that it developed in collaboration with several experts.

18.     In addition to the updated documents, Defendant also announced that it was launching a comprehensive surgical skills training curriculum.

19.     Defendant noted that surgeons must complete at least an online training course, which reviewed the critical aspects of the Durom Cup design, preoperative planning considerations and comprehensive information regarding the critical technique steps to implant the device. This was the minimum required training to resume product use.

20.     Zimmer also established webcasts as follow-up to the online training, a surgical skills course that offered experience with cadavers to practice implantation of the Durom Cup in a controlled environment, and a surgeon-to-surgeon training course with one-on-one learning with an expert in the operating room.

21.     From 2006 through the date of this Complaint, Defendant generally, manufactured, labeled, packaged, distributed, supplied, marketed, advertised, and/or otherwise engaged in all activities that are part and parcel of the sale and distribution of a pharmaceutical, and by said activities, caused the Durom Cup to be placed into the stream of commerce throughout the United States, including Alabama.

22.     Defendant made, participated in and/or contributed to filings with the FDA in conjunction the approval process for the Durom Cup.

5

23.     Upon information and belief Defendant was in control of the design, assembly, manufacture, marketing, distribution, packaging, labeling, processing, supplying, promotion, sales, and the issuance of product warnings and related information with respect to the Durom Cup.

24.     Defendant was at all times material hereto subject to the laws of the United States of America, including provisions relating to the FDA, and the rules and regulations thereof, in conjunction with the approval process, labeling, and other after-market activities that pertain to the Durom Cup.

25.     The Durom Cup has been widely advertised, marketed and represented by the Defendant as a safe and effective treatment.

26.     From the time that Defendant first began selling the Durom Cup in the United States through on or about August 16, 2008, the product labeling and product information for the Durom Cup failed to contain adequate information, instructions, and warnings concerning implantation of the product and the risks that the Durom Cup can loosen and separate from acetabulum (hip socket) in patients.

27.     Despite its knowledge of the serious injuries associated with use of the Durom Cup, Defendant engaged in a marketing and advertising program which as a whole, by affirmative and material misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of the Durom Cup was safe.

28.     Defendant downplayed and understated the health hazards and risks associated with the use of the Durom Cup and through promotional literature as well as sales visits to orthopaedic surgeons, deceived doctors, and potential users of the

6

Durom Cup by relaying positive information, while concealing the nature and extent of known adverse and serious health effects.

## FACTUAL ALLEGATIONS

29.     Prior to January 11, 2007, the treating physicians for Tommy C. Covington, as well as Plaintiff, were exposed to the aforementioned advertising and marketing campaign by the defendant directly.

30.     Plaintiff Tommy C. Covington and Plaintiff's physician, either through direct promotional contact with Sales Representative Defendants, through word-of-mouth from other health care providers, and/or through promotional materials, received the information the Defendants intended that they receive, to-wit: that the Durom Cup was safe and effective for use in THA procedures.

31.     On January 11, 2007, Plaintiff's physician implanted a Durom Cup in Mr. Covington.

32.     As a direct and proximate result of the use of the Durom Cups, Plaintiff suffered, and continues to suffer, serious bodily injury and harm.

33.     As a direct and proximate result of the use of the Durom Cups, Plaintiff incurred, and continues to incur medical expenses to treat his injuries and condition. At no time material to his use of the Durom Cups was Plaintiff or his physician(s) told, warned, notified, or given information about the risks of the use of the Durom Cup.

7

## FEDERAL REQUIREMENTS

34.     Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

35.     Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

36.     Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the, safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury. Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health. *See* 21 U .S.C. § 360i.

37.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the

8

performance of a device but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law. 21 U.S.C. § 360j(f).

38.     The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR § 820 *et seq.* As explained in the Federal Register, because the Current Good Manufacturing Practice (CGMP) regulations must apply to (i. variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device. Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured, and the manufacturing processes employed. Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

39.     Pursuant to 21 CFR § 820.1 (c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Food Drug & Cosmetic Act ("the Act") (21 U.S.C. § 351).

40.     Pursuant to 21 CFR § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. *See* 21 CFR § 820.3(v).

41.     Pursuant to 21 CFR § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

42.     Pursuant to 21 CFR § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

43.     Pursuant to 21 CFR § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

44.     Pursuant to 21 CFR § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

45.     Pursuant to 21 CFR § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

46.     Pursuant to 21 CFR § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots, or batches, or their equivalents. Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

47.     Pursuant to 21 CFR § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

48.     Pursuant to 21 CFR § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

10

49.     Pursuant to 21 CFR § 820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Such process controls shall include:

     a.     Documented instructions, standard operating procedures (SOP's), and methods that define and control the manner of production;

     b.     Monitoring and control of process parameters and component and device characteristics during production;

     c.     Compliance with specified reference standards or codes;

     d.     The approval of processes and process equipment; and

     e.     Criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

50.     Pursuant to 21 CFR § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

51.     Pursuant to 21 CFR § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

52.     Pursuant to 21 CFR § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

53.     Pursuant to 21 CFR § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use.

54.     Pursuant to 21 CFR § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

55.     Pursuant to 21 CFR § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

56.     Pursuant to 21 CFR § 820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained.

57.     Pursuant to 21 CFR § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. 21 CFR § 820.3(z)(1).

58.    Pursuant to 21 CFR § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified individuals.

59.    Pursuant to 21 CFR § 820.90, each manufacturer shall establish and maintain procedures to control products that do not conform to specified requirements.

60.    Pursuant to 21 CFR § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

      a.    Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems;

      b.    Investigating the cause of nonconformities relating to product, processes, and the quality system;

      c.    Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

      d.    Verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

      e.    Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

      f.    Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the

quality of such product or the prevention of such problems; and

g.   Submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

61.   Upon information and belief, defendants' Durom Cup devices are adulterated pursuant to 21 U.S.C. § 351 because, among other things, they failed to meet established performance standards, and/or the methods, facilities, or controls used for their manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

62.   Upon information and belief, defendants' Durom Cup devices are misbranded because, among other things, they are dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

63.   Upon information and belief, defendants' Durom Cup devices are adulterated pursuant to 21 U.S.C. § 351 because defendants failed to establish and maintain CGMP for its Durom Cup devices in accordance with 21 CFR § 820 *et seq.,* as set forth above.

64.   Upon information and belief, defendants failed to establish and maintain CGMP with respect to the quality audits, quality testing and process validation for its Durom Cup devices.

65.   As a result of defendants' failure to establish and maintain CGMP as set forth above, defendants Durom Cup devices were defective and failed, resulting in injuries to plaintiff.

66.   If defendants had complied with the federal requirements regarding CGMP, defendants' Durom Cup devices would have been manufactured properly such that they would

not have resulted in injuries to plaintiff.

## COUNT I
## (ALABAMA EXTENDED MANUFACTURER'S LIABILITY DOCTRINE-
## DEFECTICVE MANUFACTURING)

67.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

68.    Defendant is the manufacturer, designer, distributor, seller, and/or supplier of orthopedic devices including the Durom Cup.

69.    The Durom Cup devices manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by defendants, were defective and unreasonably dangerous in their manufacture and construction when they left the hands of defendants in that they deviated from product specifications and/or applicable federal requirements for these medical devices, posing a serious risk of injury and death. The product was expected to, and did, reach the end user or consumer, without substantial change in the condition in which it was sold.

70.    As a direct and proximate result of plaintiff's use of defendants' Durom Cup devices, as manufactured, designed, sold, supplied and introduced into the stream of commerce by defendant and/ or the failure to comply with federal requirements, plaintiff has suffered physical injury, harm, damages and economic loss will continue to suffer such harm, damages and economic loss in the future.

71.    Plaintiff contends that the conduct of the defendants is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of exemplary damages as permitted by Alabama Code §6-11-20.

15

## COUNT II
## (ALABAMA EXTENDED MANUFACTUREER'S LIABILITY DOCTRINE-DESIGN DEFECT)

72.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

73.     Defendant is the manufacturer, designer, distributor, seller, and/or supplier of orthopedic devices including the Durom Cup.

74.     The Durom Cup devices, manufactured and supplied by defendant were defective and unreasonably dangerous in design or formulation in that, when they left the hands of the defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation, or it was more dangerous than an ordinary consumer would expect, and/or it failed to comply with federal requirements for those medical devices. The product was expected to, and did, reach the plaintiff without substantial change in the condition in which it was sold.

75.     The foreseeable risks associated with the design or formulation of the Durom Cup devices, include, but are not limited to, the fact that the design or formulation of the Durom Cup devices is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or it failed to comply with federal requirements.

76.     As a direct and proximate result of plaintiff's use of the Durom Cup device, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by defendants and/or their failure to comply with federal requirements, plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

77.     Plaintiff contend that the conduct of the defendants is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for

16

human life and safety, so as to warrant the imposition of exemplary damages as permitted by Alabama Code §6-11-20.

**COUNT III**
**(ALABAMA EXTENDED MANUFACTURER'S LIABILITY DOCTRINE-**
**MARKETING DEFECTS/FAILURE TO WARN)**

78.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

79.     Defendant is the manufacturer, designer, distributor, seller, and/or supplier of orthopedic devices including the Durom Cup Device.

80.     The Durom Cup devices manufactured and supplied by defendants were defective in that, when it left the hands of the defendant, they did not conform to representations made by defendant concerning the product and/or with applicable federal requirements and defendants failed to warn of the defects, problems, risks or hazards with its product. Defendants had a duty to warn of the risks and dangers of its products because it knew these products were being placed in the human body and could cause substantial physical harm and suffering when used in their normal and customary manner. Defendants breached their duty, because their warning was inadequate and the breach proximately caused harm to the plaintiff.

81.     Defendants distributed and sold the Durom Cup devices in the condition in they left their place of manufacture, in their original form of manufacture, which included the defects described herein. The Durom Cup devices were expected to and did reach plaintiff without substantial change or adjustment in their condition as manufactured and sold by defendants.

82.     The Durom Cup devices designed, developed, tested, manufactured, marketed

17

and sold or otherwise placed into the stream of commerce by defendant were in dangerous and defective condition and posed a threat to any user or consumer of the Durom Cup devices. Plaintiff was and is in a class of persons that defendants should have been considered to be subject of harm caused by the defective nature of the Durom Cup devices.

83. The Durom Cup devices were implanted and used in the manner for which they were intended. This use has resulted in severe physical, emotional and other injuries to Plaintiff.

84. Defendants knew or should have known through testing, adverse event reporting, or otherwise, that the Durom Cup devices created a high risk of bodily injury and serious harm.

85. Defendants failed to provide adequate and timely warnings or instructions regarding the Durom Cup and their known defects.

86. Plaintiff and/or her physician justifiably relied upon defendants' warnings or lack thereof regarding the Durom Cup devices, when they selected these products to be used in surgery.

87. As a direct and proximate result of plaintiff's use of the Durom Cup devices, and defendants' breach of their duty to warn of the dangers and risks regarding the character and quality of Durom Cup devices and/or the failure to comply with federal requirements, plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

88. Plaintiff contends that the conduct of the defendants is attended by circumstances of oppression, fraud, malice, or willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of exemplary

damages as permitted by Alabama Code §6-11-20.

## COUNT VI
## (NEGLIGENCE/WANTONNESS)

89.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

90.     Defendant had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Durom Cup devices into the stream of commerce, including a duty to assure that their products did not pose a significantly increased risk of bodily harm and adverse events and/or a duty to comply with federal requirements.

91.     Defendants have an obligation to not violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Durom Cup devices, and other wise distributing the Durom Cup devices.

92.     Defendants' acts and omissions constitute an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 (a) and 333(a)(2), and constitute a breach of duty subjecting defendants to civil liability for all damages arising from.

93.     Plaintiff, as a purchaser of Durom Cup devices, is within the class of persons the statutes and regulations (described above) are designed to protect, and plaintiffs injuries are the type of harm these statutes and regulations are designed to prevent.

94.     Defendants failed to exercise ordinary care and/or were wanton in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of the Durom Cup devices into interstate commerce in that defendants knew or should have know that these products caused significant bodily harm

19

and were not safe for use by consumers, and/or through failure to comply with federal requirements.

95.     Despite the fact that defendants knew or should have known that the Durom Cup devices posed a serious risk of bodily harm to consumers, defendants continued manufacture and market the Durom Cup devices for use by consumers and/or continued to fail to comply with federal requirements.

96.     Defendants knew or should have known that consumers such as plaintiff would forseeably suffer injury as a result of defendants' failure to exercise ordinary care and/or wanton conduct as described above, including the failure to comply with federal requirements.

97.     As a direct and proximate result of defendant's negligence and/or wantonness, plaintiff suffered serious physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages and economic loss in the future.

98.     Plaintiff contends that the conduct of the defendants, as described above, including  but not limited to their failure to adequately design and manufacture, as well as its continued marketing and distribution of the Durom Cup devices when they knew or should have known of the serious health risks these devices created and/or the failure to comply with federal requirements, is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, and constitutes a conscious, reckless and flagrant disregard for human life, so as to warrant the imposition of exemplary damages as permitted by Alabama §6-11-20.

## COUNT V
### (BREACH OF EXPRESS WARRANTY)

99.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

20

100.        Defendant advertised, labeled, marketed and promoted its product, the Durom Cup, representing the quality to health care professionals, the FDA, Plaintiff Tommy C. Covington, and the public in such a way as to induce its purchase or use, thereby making an express warranty that the Durom Cup would conform to the representations. More specifically, Defendant represented that the Durom Cup was safe and effective, that it was safe and effective for use by individuals such as Plaintiff, and/or that it was safe and effective to treat Plaintiff's condition.

101.        The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

102.        The Durom Cup did not conform to the representations made by Defendant in that the Durom Cup was not safe and effective, was not safe and effective for use by individuals such as Plaintiff, and/or was not safe and effective to treat in individuals, such as Plaintiff.

103.        At all relevant times, Plaintiff used the Durom for the purpose and in the manner intended by Defendant.

104.        Plaintiff and Plaintiff's physician, by the use of reasonable care, would not have discovered the breached warranty and realized its danger.

105.        The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries.

106.        As a direct result of Defendant's conduct as aforesaid, Plaintiffs suffered and continue to suffer serious and permanent non-economic and economic

21

injuries.

## COUNT V
### (BREACH OF IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE ALA. CODE §7-2-314; 7-2-315)

107.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein

108.    At the time defendants designed, manufactured marketed, sold, and distributed the Durom Cup devices for use by plaintiff, defendants knew of the use for which the Durom Cup Devices were intended and impliedly warranted these products to be of merchantable quality and safe for their particular use and that their design, manufacture, labeling, and marketing complied with all applicable federal requirements.

109.    Plaintiff and/or her physician reasonably relied upon the skill and judgment of defendants as to whether the Durom Cup were of merchantable quality and safe for their intended use and upon defendant's implied warranty as to such matters, including that they were in compliance with all federal requirements.

110.    Contrary to such implied warranties, Defendant's Durom Cup Devices were not of merchantable quality or safe for their particular intended use, because the products were defective as described above, and/or failed to comply with federal requirements.

111.    As a direct and proximate result of defendant's breach of warranties, plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT VI
### (UNJUST ENRICHMENT)

112.       Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein

113.       As the intended and expected result of their conscious wrongdoing, defendants have profited and benefited from the purchase of defendant's Durom Cup devices by plaintiff.

114.       Defendants have voluntarily accepted and retained these profits and benefits derived from plaintiff, with full knowledge and awareness that, as a result of defendants' fraud and other conscious and intentional wrongdoing, plaintiff was not receiving a product of the quality, nature or fitness that had been represented by defendants or that plaintiff, as a reasonable consumer expected.

115.       By the virtue of the conscious wrongdoing alleged above, defendants have been unjustly enriched at the expense of plaintiff, who is entitled to in equity, and hereby seeks, the disgorgement and restitution of defendants' wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the court; and such other relief as the Court deems just and proper to remedy the defendant's unjust enrichment.


### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury as to all issues so triable.

_____
**KEITH T. BELT, JR. (BEL026) (ASB-6843-T79K)**
Attorneys for Plaintiff

OF COUNSEL:

BELT LAW FIRM, P.C.
Lakeshore Park Plaza, Suite 208
2204 Lakeshore Drive
Birmingham, AL 35209
Phone: (205) 933-1500
Fax:    (205) 933-5500
E-Mail: keithb@beltlawfirm.com

## REQUEST FOR CERTIFIED MAIL SERVICE BY CLERK

The plaintiff hereby requests that the clerk serve the defendants by certified mail, return receipt requested.

**ZIMMER HOLDINGS, INC.**
**c/o Corporation Service Company**
**2711 Centerville Road, Suite 400**
**Wilmington, DE 19808**

_____
OF COUNSEL